# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NEAL BREGMAN | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO. |
| | : | 3:04-cv-1657 (CFD) |
| v. | : | |
| | : | |
| HARTFORD LIFE AND ACCIDENT | : | |
| INSURANCE COMPANY and | : | |
| THE INCOME PROTECTION PLAN | : | |
| | : | |
| Defendants | : | |

## RULING ON
## MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND
## MOTION FOR SUMMARY JUDGMENT

I.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -3-

II.     Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -3-
        A.      The Hartford Life LTD Insurance Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . .  -3-
        B.       Bregman's Conditions and LTD Claims       . . . . . . . . . . . . . . . . . . . . . . . . .  -4-

III.    Summary Judgment Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -7-

IV.     The Plaintiff's Claim for Denial of ERISA Benefits (Count 1). . . . . . . . . . . . . . . . .  -9-
        A.      Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -9-
        B.      Scope of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -10-
        C.      Relevant Considerations in Evaluating Total Disability. . . . . . . . . . . . . . . .  -11-
                1.      Opinions and Reports of Bregman's Physicians. . . . . . . . . . . . . . . .  -11-
                2.      Subjective Complaints of Pain and Other Physical Conditions. . . . . .  -15-
                3.      Interaction Between Concurrent Physical Illnesses. . . . . . . . . . . . . .  -15-
                4.      Video Surveillance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -16-
                5.      IMEs Requested by Hartford Life. . . . . . . . . . . . . . . . . . . . . . . . . .  -16-
                6.      Hartford Life's Previous Decision to Award Benefits. . . . . . . . . . . .  -18-
                7.      Bregman's Vocational Capacity in Light of Non-Exertional Limitations
                        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -18-
                8.      Social Security Disability Award. . . . . . . . . . . . . . . . . . . . . . . . . . .  -19-
        E.      Evaluation of Bregman's Disability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -20-

V.      Plaintiff's Claim for Attorney's Fees and Costs (Count 2). . . . . . . . . . . . . . . . . . .  -21-

VI.     Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -21-

I.    Introduction

Neal Bregman, a former employee of Perkin-Elmer Corporation ("Perkin-Elmer"),[1] brought this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., alleging unlawful termination of long term disability ("LTD") benefits by Hartford Life and Accident Insurance Company ("Hartford Life"), provider of Perkin-Elmer's employee benefits plan. Bregman seeks payment of the terminated LTD benefits in Count One of the Complaint. He seeks attorney's fees and costs in Count Two. Both parties have filed motions for summary judgment on the administrative record. The Court grants Bregman's motion for the following reasons.

II.   Factual Background

Bregman was employed at Perkin-Elmer for approximately twenty-three years, and during that time was a participant in the company's employee benefit plan ("The Income Protection Plan"). At the time of his LTD claim, Bregman was employed as a Project Manager responsible for developing and maintaining a database identifying the location and serial number of laptop computers used at Perkin-Elmer. Bregman's psychological history includes learning disorder and attention-deficit/hyperactivity disorder ("AD/HD") but he appears to have functioned well at work prior to July 1996.

A.    The Hartford Life LTD Insurance Plan

Hartford Life's Income Protection Plan provided LTD insurance to Perkins-Elmer employees who became either partially or totally disabled as defined by the plan. Under the plan's definitions, a person is "Totally Disabled" when "prevented by Disability from doing all

_____

[1]Subsequently known as Applera Corporation.

the material and substantial duties of [his] own occupation" for 24 months after the beginning of coverage.[2]  After that, a person is Totally Disabled when "prevented by Disability from doing any occupation or work for which [he is] or could become qualified by (1) training; (2) education; or (3) experience."  A person receiving or entitled to benefits while Totally Disabled but "able to perform some but not all of the material and substantial duties of [his] or any occupation on either a full-time or part-time basis," and "engaged in a program of Rehabilitative Employment," is considered "Partially Disabled" under the plan's definition.

Under the plan's provisions, a person "Disabled because of (1) Mental Illness which results from any cause [or] (2) any condition which may result from Mental Illness" may receive benefits for a total of 24 months for all such disabilities during the claimant's lifetime, unless "confined in a hospital or other place licensed to provide medical care for your Disability."

B.     Bregman's Conditions and LTD Claims

Bregman left work on July 3, 1996 as a result of the sudden worsening of his learning disorder and AD/HD and his inability to focus or to cope with stress at work and in his family life.  This deterioration in functioning appears to have been triggered by an increase in his workload and the removal of his administrative support.  During late 1996 and early 1997, Bregman was diagnosed by his psychiatrist, Dr. Robert Israely, with depression, bipolar disorder, severe learning disorders, AD/HD, sleep apnea (a disorder characterized by interrupted breathing during sleep), and postconcussion syndrome resulting from a fall that occurred while  Bregman was on medical leave.  Bregman's symptoms also included clumsiness, moodiness, and difficulty focusing his vision.  Bregman was prescribed several medications for these conditions and was

---

[2]All terms of coverage are contained in the plan's policy booklet.  (HL 680-695).

unable to drive during this time due to his problems with balance, focus and attention. Bregman was also diagnosed by orthopedic specialist Dr. Charles Lettvin with plantar fasciitis and very tight achilles tendons, conditions causing foot pain. Bregman filed a claim for LTD benefits in 1997. It was approved on March 19, 1997 under the mental illness provision of the plan, and Bregman was notified of the applicability of the 24-month limitation of benefits. Bregman also divorced from his wife and was granted custody of his two sons.

Bregman subsequently experienced other medical conditions, including severe carpal tunnel syndrome in both wrists, significant sleep apnea for which treatment was unsuccessful, myopathy (muscle disorder), lower back pain, and lower extremity weakness and pain resulting from polyneuropathy (nerve disorder). He was at this time 45 years old, overweight, and suffered from high blood pressure. On October 21, 1998, roughly 22 months after LTD coverage had commenced, Hartford Life changed Bregman's status to Totally Disabled as a result of his physical illnesses and extended coverage beyond the 24-month mental illness disability period. Hartford Life re-evaluated Bregman's claim periodically from 1999 through 2002 but did not change the status of his benefits during these years. Bregman's condition did not improve; on the contrary, he experienced kidney problems in 2002 and ultimately underwent multiple surgeries for kidney stones.

In 2002, after Hartford Life began to suspect that Bregman was engaging in activities inconsistent with his claimed limitations, the insurance company arranged for video surveillance of Bregman. The surveillance occurred on May 28-30, July 1-3, and September 4, 2002. The investigation report and video submitted with the record show Bregman driving his car, walking (briskly) into and out of his residence, walking into and out of a restaurant carrying a bag of take-

out food, ascending and descending 1-3 steps to enter his residence and the restaurant, and opening and closing the hatch of his vehicle.

In September and October 2002, Hartford Life requested and obtained independent medical evaluations ("IMEs") of Bregman from the University Disability Consortium ("UDC"), an organization that specializes in evaluating disability claims. The UDC reviews of both Bregman's physical and his mental conditions were based primarily on (1) his medical records and (2) conversations with some of his treating physicians.[3]

After reviewing these IMEs, Hartford Life discontinued Bregman's LTD benefits effective May 20, 2003. It found that none of his conditions, nor the totality of all his medical conditions, would preclude work in any sedentary occupation including his own occupation as Project Manager. In a letter informing Bregman of its decision, Hartford Life listed its conclusions regarding his physical conditions. (Administrative Record, HL 654-664) (hereafter, "HL ___"). Bregman, through his attorney, appealed Hartford Life's decision on November 25, 2003. (HL 544-558).

---

[3] An IME by Dr. Alexander concluded that Bregman's renal issues (including the kidney stones) would not be occupationally impairing. A review by Dr. Greenberg concluded that Bregman's psychiatric status was stable and had been for about a year. A review by Dr. King concluded that the medical record contained no objective evidence of either neuropathy or myopathy, and that other sensory impairments in Bregman's hands, fingers and feet were only minor. Dr. King also concluded that Bregman's obesity, rather than a peripheral neuropathy, likely explained electromyography (EMG) test results even though Bregman "has many clinical symptoms of a peripheral neuropathy." (HL 756). Only one IME, Dr. Linburg's, appears to have included a new physical exam of Bregman, and this IME addressed the carpal tunnel syndrome in Bregman's hands. Dr. Linburg (an orthopedic surgeon) concluded that Bregman had ongoing, "mild to moderate" carpal tunnel syndrome but that with regard to his hands, Bregman would be capable of work so long as the work would not require heavy or repetitive use of the hands (e.g. "being on a computer all day long, using hand tools for repetitive assembly or a job that required prolonged periods of driving.") (HL 719).

Hartford Life failed to meet the regulatory requirements for a timely review of appeals, which expired after an initial 45-day period plus a maximum extension of 45 additional days. However, a final resolution of the appeal was reached on April 26, 2004, after Hartford Life reviewed updated medical records and again referred the claim to UDC for additional IMEs. These IMEs were once again based on a review of Bregman's medical records and conversations with Bregman's doctors. This time, Hartford Life determined that Bregman was in fact totally disabled due to a combination of physical disorders and mental illness. Because Bregman had already received benefits under the Mental Illness provision of the policy for approximately 22 months prior to October 1998, additional benefits were payable for approximately two more months under the mental illness limitation in the policy. However, no further LTD benefits were approved beyond the end of the twenty-four month mental disability period.

Bregman maintains that Hartford Life did not give sufficient weight to the opinions of his physicians, did not conduct sufficient independent medical examinations of Bregman, and improperly disregarded the Social Security Administration award of disability benefits. Hartford Life maintains that Bregman failed to establish that he was disabled at the time of the April 26, 2004 decision, or alternatively that if he was disabled, the disability resulted in part from mental illness, and therefore Bregman has been paid all benefits to which he is entitled under the 24-month limitation in the policy.

III.    Summary Judgment Standard

Although, as set forth below, this case involves the review of an administrative record, the familiar summary judgment standard applies. See Gibbs ex rel. Estate of Gibbs v. CIGNA Corp., 440 F.3d 571, 575 (2d Cir. 2006). The burden is on the moving party to establish that

there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)); accord Miner v. City of Glen Falls, 999 F.2d 655, 661 (2d Cir. 1993). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

Where the nonmoving party has the burden of proof at trial, the moving party need only demonstrate that there is a lack of evidence to support the nonmovant's claim. Celotex, 477 U.S. at 323-25; Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95 (2d Cir. 1998). Once the movant has established a prima facie case demonstrating the lack of a genuine issue of material fact, the nonmoving party must provide enough evidence to support a jury verdict in its favor. Anderson, 477 U.S. at 248; Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). A plaintiff, as the nonmovant, may not rely on conclusory statements or mere contentions that the evidence in support of summary judgment is not credible. Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). Similarly, a plaintiff may not rest "merely on allegations or denials" in its complaint to demonstrate the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(e). Therefore, after discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex, 477 U.S. at 323. When addressing a motion for summary judgment, the Court resolves "all ambiguities and draw[s] all inferences in favor of the

nonmoving party in order to determine how a reasonable jury would decide." <u>Aldrich v. Randolph Cent. Sch. Dist.</u>, 963 F.2d 520, 523 (2d Cir. 1992). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." <u>Bryant</u>, 923 F.2d at 982.

IV.    <u>The Plaintiff's Claim for Denial of ERISA Benefits (Count 1)</u>

A.    <u>Standard of Review</u>

    A denial of benefits challenged under ERISA is reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989). As both parties agree that this case is to be reviewed *de novo*, the Court need not determine whether the plan administrator had discretionary authority to determine eligibility for benefits,[4] nor need the Court determine whether any conflict of interest arising from Hartford Life's dual role in determining eligibility for benefits and paying benefits claims affected the reasonableness of Hartford Life's determination that Bregman was no longer entitled to benefits.[5] <u>See</u> <u>Sullivan v. LTV Aerospace and Defense Co.</u>, 82 F.3d 1251, 1255-56 (2d Cir.

_____

    [4]The Policy Booklet describing the Group Benefits Plan under which Bregman was insured contains no express grant of discretionary authority.  The parties have not briefed the issue of whether the plan administrator had discretionary authority to determine eligibility for benefits.

    [5]The Court also need not address the plaintiff's argument that Hartford Life's late decision on the appeal created a right to *de novo* review.
    The affirmative defense of failure to exhaust plan remedies also has not been raised and would not be applicable here because Hartford Life failed to reach a resolution of the appeal within the deadline prescribed by ERISA (45 days, plus a maximum extension of an additional 45 days).  The applicable regulation deems the claimant under these circumstances to have exhausted the administrative remedies available under the plan and entitles him to pursue any available remedies under section 502(a) of the Act.  <u>See</u> 29 C.F.R. §§ 2560.503-1 (i)(1), (i)(3)(I),

1996) (in cases where the plan administrator is shown to have a conflict of interest and was in fact influenced by the conflict of interest, the court interprets the plan de novo). <u>See also</u> <u>Metropolitan Life Ins. Co. v. Glenn</u>, 128 S.Ct. 2343 (2008).

Upon *de novo* review, "a district court may render a determination on a claim without deferring to an administrator's evaluation of the evidence," and "is free to evaluate a treating physician's opinion in the context of any factors it considers relevant, such as the length and nature of their relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence." <u>Lochner v. Unum Life Ins. Co. Of Am.</u>, 389 F.3d 288, 296-7 (2d Cir. 2004).

B.    <u>Scope of Review</u>

Both parties agree that the Court may decide this case on the administrative record, and in an ERISA case, review is ordinarily limited to the administrative record. See, e.g., <u>Krizek v. Cigna Group Ins.</u>, 345 F.3d 91, 97 (2d Cir. 2003). However, a court may expand its review for good cause. Good cause is most often found where there was a conflict of interest and a defect in the procedures followed during administrative review. <u>See, e.g.</u>, <u>id.</u> at 98, n.3 ("[D]istrict courts [should] resolve the conflict issue in advance and, only upon finding 'good cause,' permit the parties to introduce evidence beyond the administrative record."). A demonstrated conflict of interest is sufficient; the plaintiff "need not demonstrate that the conflict caused her actual prejudice in order for the Court to consider the conflict to be good cause." <u>DeFelice v. Am. Int'l Life Assurance Co.</u>, 112 F.3d 61, 67 (2d Cir.1997). However, it would be inappropriate for the Court to base its decision on information that originated after the date of the administrator's final

_____

(l).

decision. "Were it otherwise, a claimant could keep the record indefinitely open, in derogation of plan requirements, and force the administrator perpetually to attempt to respond to new submissions. That is plainly not permitted under ERISA and its regulations." Maskara v. First Unum Life Ins. Co., 2004 U.S. Dist. LEXIS 13002 at *3-4 (S.D.N.Y., July 12, 2004).

The Court finds that considering evidence outside the administrative record is within its discretion as a result of the conflict of interest arising from Hartford Life's role as both administrator and insurer, which in this case constitutes "good cause" to allow augmentation of the record. See also Paese v. Hartford Life & Accident Ins. Co., 449 F.3d 435, 441 (2d Cir. 2006) (Hartford Life was not disinterested because it was both administrator and insurer); DeFelice, 112 F.3d at 66 (where a de novo standard of review applied, "[a] demonstrated conflict of interest in the administrative reviewing body is an example of 'good cause' warranting the introduction of additional evidence."). In DeFelice, the Second Circuit contrasted its "good cause" requirement for introduction of extrinsic evidence under the de novo review standard with requirement under the arbitrary and capricious standard that the plaintiff demonstrate that the conflict caused "actual prejudice." Id. However, the Court does not find good cause to extend the review period beyond April 26, 2004. The court will therefore decline to include in its consideration the plaintiff's later diagnosis of diabetes, or any other evidence that similarly originates well after the April, 2004 appeal decision.

C.    Relevant Considerations in Evaluating Total Disability

1.    Opinions and Reports of Bregman's Physicians

The opinions and diagnoses of Bregman's treating physicians are clearly relevant to the Court's determination of Bregman's level of disability. However, "ERISA does not require plan

administrators to accord special deference to the opinions of treating physicians." Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003). In weighing the opinions of Bregman's physicians against those of the independent reviewers retained by Hartford Life, the Court considered the following factors: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) other relevant factors. See Karanda v. Connecticut Gen. Life Ins. Co., et al., 158 F. Supp. 2d 192, 205 and n.8 (D. Conn. 2000) (citing Durr v. Metropolitan Life Ins. Co., 15 F. Supp. 2d 205, 213 (D. Conn. 1998)) (listing factors relevant in evaluating a treating physician's opinion and comparing it to a non-treating physician's opinion, and noting that these factors are instructive, though not binding).

The record contains several opinions of Bregman's treating physicians, most notably the following:

*Letter from Dr. Cuzzone, October 18, 2003*. After seeing Bregman "on many occasions over the last several years . . . . because of his polyneuropathy, resulting in pain, numbness, and paresthesias in his extremities, and carpal tunnel syndrome . . . ." Dr. Cuzzone states that "[o]bjectively [in August 2003, Bregman] did have difficulty manipulating small objects in his hands and had several lacerations on the tips of his fingers. Another complaint was difficulty with balance because he has problems sensing where his feet are in space. He frequently loses his balance especially when he is walking. . . ." (HL 567).

*Letter from Dr. Dodds, February 17, 2004*. Dr. Dodds states, after treating Bregman for one year for his kidney stones, that "multiple [kidney stones] have been extremely difficult to treat, despite multiple operations . . . . [Bregman's] complex medical problems intertwine and combine to

increase his overall level of disability."  (HL 324).

*Report of Dr. Erman, November 21, 2003*.  This letter documents Dr. Erman's diagnosis of total disability resulting from a combination of severe sleep apnea, chronic and recurrent kidney stones, peripheral neuropathy, lower back pain, AD/HD and obesity.  Dr. Erman applied the AMA Guides to the Evaluation of Permanent Impairment to quantify the "percent impairment of the whole person" resulting from each of these conditions, and then the combined effect of the conditions using the AMA method.  The result was a total impairment of between 73% and 87% of a normal person, with component impairment of 20%-45% from sleep apnea, 15%-30% from kidney stones, 26%-60% from peripheral neuropathy, and 10% from lower back pain. (HL 559-561).

*Supplemental Report of Dr. Erman, November 21, 2003*.  Dr. Erman notes that "Bregman's sleep apnea is a serious condition . . . . not an isolated condition.   He is overweight . . . . With his other problems like the kidney stones, back problems, fatigue, and others, it is very difficult to address the obesity.  Exercise is nearly impossible, and significant dietary modifications are limited by the medications he is taking. (HL 371).

*Dr. Erman's Revisions to the UDC's characterization of his evaluation, April 4, 2004*.  Dr. Erman notes that Bregman's return to part time work will not be "within a few weeks" (as stated by the UDC reviewer) but rather "as tolerated." (HL 271).  Dr. Erman also notes that a "major complaint" is Bregman's continued daytime drowsiness and need for stimulants, as well as his chronic kidney stones.

*Report by Dr. Johnson, October 20, 2003*.  Dr. Johnson (who started treating Bregman in April, 2003) lists five physical conditions and one mental condition (AD/HD) and concludes: "Given

the constellation of patient's physical and emotional issues as well as his inability to attain maximum benefit from his C-PAP, I do not believe he is capable of holding full time employment. . . . it is also clear that he has not been able to benefit from the therapy because of the conflicting interest of his multiple diseases. Therefore, it is clear to me that he should be medically disabled." (HL 565-566).

Dr. Johnson repeats and reaffirms his diagnosis in a _Letter to Attorney Adler, February 10, 2004_. (HL 330-331) ("There is no question as to Bregman's diligence in pursuing not only treatment for his obstructive sleep apnea syndrome and daytime somnolence but also treatment for his other co-morbidities . . . . none of this should obscure the reality of his clear obstructive sleep apnea, his clear excessive daytime somnolence and his clear inability to sustain employment . . . . It would be irrational to put this man on the road driving back and forth to a job . . . . It would also be irresponsible to put him in any position of responsibility with his daytime somnolence.").


_Dr. Johnson, Letter to UDC, April 9, 2004._ Dr. Johnson notes that motivation is not the limiting factor in Bregman's return to work. He states that Bregman has no physical limitations to sedentary or light duty activity, "understanding that his nephropathy is very labile and absenteeism is a major risk during flares." He also writes that focusing on physical issues misses a "crucial point": "the constellation of Bregman's physical and emotional disease is interfering with his ability to earn a living and with living in general." (HL 267).

_Letter from Dr. Rose, November 10, 2003_ (after viewing the video surveillance). Dr. Rose states that the surveillance video is "limited" and erroneously attributed certain actions to Bregman. Dr. Rose's diagnosis of Bregman is that he has myopathy and moderate to severe peripheral

neuropathy. After viewing the video surveillance, she states that "Bregman is totally disabled from doing any occupation or work." (HL 563-564).

2.     <u>Subjective Complaints of Pain and Other Physical Conditions</u>

This Court has held that "[w]here the record reveals well-documented complaints of chronic pain, and there is no evidence in the record to contradict the claimant's complaints, the claim administrator, and the court, cannot discredit the claimant's subjective complaints." <u>Quigley v. UNUM Life Ins. Co. of America</u>, 340 F. Supp. 2d 215, 224 (D.Conn. 2004). Although in this case the IMEs conducted by UDC reviewers contradict Bregman's subjective complaints, the Second Circuit has nonetheless stated that "the subjective element of pain is an important factor to be considered in determining disability." <u>Connors v. Connecticut General Life Ins. Co.</u>, 272 F.3d 127, 136 (2d Cir. 2001) (citing <u>Mimms v. Heckler</u>, 750 F.2d 180, 185 (2d Cir. 1984)). "While a district court reviewing an administrator's decision <i>de novo</i> is not required to accept such complaints as credible, . . . it cannot dismiss complaints of pain as legally insufficient evidence of disability." <u>Id.</u> (citing <u>Rivera v. Schweiker</u>, 717 F.2d 719, 724 (2d Cir. 1983), <u>Marcus v. Califano</u>, 615 F.2d 23, 27 (2d Cir. 1979)). Bregman's subjective complaints of pain, weakness, lack of coordination, daytime drowsiness, inability to use his fingers, etc. are therefore relevant in determining Bregman's level of disability. <u>See, e.g.</u>, Report of Mark Hudson, including transcript of August 21, 2002 statement by Bregman (HL 1700-1708).

3.     <u>Interaction Between Concurrent Physical Illnesses</u>

The "constellation" effect, <i>i.e.</i> the interaction between Bregman's physical conditions and their combined effect on his level of disability, appears to have been considered by Hartford Life in its determination of Bregman's ability to work, and is appropriately considered by the Court as

well. See Gold v. Secretary of Health, Ed. & Welfare, 463 F.2d 38, 42 (2d Cir. 1972) (citing Burns v. Celebrezze, 234 F. Supp. 1019, 1020 (W.D.N.C. 1964)) ("In assessing disability [under the Social Security Act], 'all complaints [of a claimant] must be considered together in determining [] work capacity.'").

Several opinions of Bregman's treating physicians note that the interaction of Bregman's physical conditions results in his total disability. See list of treating physician's opinions, *supra*.

4.     Video Surveillance

The Court finds that use of video surveillance of a claimant's behavior to help inform an evaluation of the claimant's disability level is not *per se* improper. However, another court has noted that "the information gleaned is not necessarily dispositive on its face and must be considered within the context of the particular case." Glockson v. First Unum Life Ins. Co., 2006 U.S. Dist. LEXIS 47613 at *16 (N.D.N.Y. July 6, 2006). In this case, video surveillance shows that Bregman can walk normally (and somewhat briskly) for short distances, such as between his car and his front door; he can also drive a car. However, the video provided contains only short (seconds- or minutes-long) recordings of Bregman's activity and is in not conclusive evidence that he is not disabled. (See Letter from Dr. Rose, HL 563-564).

5.     IMEs Requested by Hartford Life

Independent medical evaluations conducted for the purpose of evaluating a claimant's physical condition may be based on medical records; ERISA does not require reviewers to personally re-examine the patient. Bella v. Metropolitan Life Ins. Co., 1999 WL 782132 at *5

(W.D.N.Y. Sept. 30, 1999).[6]

The IMEs requested by Hartford Life were entirely based on Bregman's medical records and on conversations with his doctors, with the exception of one IME concerning only Bregman's carpal tunnel syndrome and the functionality of his hands. The UDC's reviewing physicians disagreed with at least one of Bregman's treating physicians (Dr. Johnson, see HL 267). The disagreement concerned the daytime effects of Bregman's sleep apnea (his daytime somnolence and fatigue) and the interference of this condition with part-time work; the likely interference of his kidney disease with attendance at work; Dr. Johnson's opinion that AD/HD rather than lack of motivation was a limiting factor in Bregman's ability to work, and whether the physical conditions permitted any quantifiable estimate of the time remaining before Bregman's transition from part-time to full-time work.

The record also contains Hartford Life's admission that the video surveillance of Bregman was incorrectly characterized by Hartford Life and by at least one of the UDC reviewers who evaluated Bregman's condition. Specifically, the video was characterized as

---

[6]However, IMEs conducted for the purpose of evaluating a claimant's mental condition in the absence of an actual re-examination of the claimant are less useful because "[u]nlike cardiologists or orthopedists, who can formulate medical opinions based upon objective findings derived from objective clinical tests, the psychiatrist typically treats his patient's subjective symptoms." Sheehan v. Metropolitan Life Ins. Co., 368 F.Supp.2d 228, 255 (S.D.N.Y. 2005). Courts therefore "routinely discount or entirely disregard the opinions of psychiatrists who had not examined the individual in question at all or for only a limited time." Id. at 254 (citing several supporting cases). Dr. Greenberg, the UDC reviewer of Bregman's psychological condition, conducted a review based only on medical records and conversations with Dr. Israely, Bregman's psychiatrist. The Court finds that the lack of re-evaluation of Bregman's psychological condition reduces the probative value of Dr. Greenberg's, and therefore Hartford Life's, conclusions regarding the severity of Bregman's mental illness and their effect on his level of disability, but because the Court bases its decision in this case solely on Bregman's physical conditions, need not look more closely at the severity of his mental conditions.

containing observations that Bregman skipped stairs, carried books and other items, and wheeled

trash cans to his curb (all of which Hartford Life has admitted are incorrect, as other individuals

were observed doing these things, not Bregman).  At least one of Bregman's treating physicians

has objected to this mischaracterization.  (See letter from Dr. Rose, HL 563). The apparent

misuse of the video surveillance during the review process calls into question any conclusions of

the IMEs that were based in any way on the video surveillance.

6.      Hartford Life's Previous Decision to Award Benefits

If benefits are terminated absent any change in the participant's medical condition, or the

applicable policy language, the previous decision to award benefits is relevant in evaluating the

reasonableness of terminating benefits. See Connors, 272 F.3d at 136 (noting significance of a

decision to terminate long term disability benefits absent any evidence of a change in the

plaintiff's condition).

The parties dispute whether Bregman's physical condition changed after Hartford Life in

October 1998 reclassified Bregman as totally disabled due to his physical conditions.  However,

Hartford Life's periodic reviews of Bregman's claim appear to have triggered both the video

surveillance in 2002 and the additional IMEs that ultimately resulted in the denial of his claim.

Hartford Life's previous classification is therefore relevant evidence, but is not conclusive in

determining whether Bregman remained totally disabled.

7.      Bregman's Vocational Capacity in Light of Non-Exertional Limitations

"[A] reasonable interpretation of a claimant's entitlement to payments based on a claim of

'total disability' must consider the claimant's ability to pursue gainful employment in light of all

the circumstances." Demirovic v. Bldg. Serv. 32 B-J Pension Fund, 467 F.3d 208, 213-14 (2d

Cir. 2006).  Thus, an administrator must consider whether a beneficiary has "the vocational capacity to perform any type of work . . . that actually exists in the national economy." Id. at 215.

The Court must also consider non-exertional limitations including (1) intellectual and psychological limitations, including those related to the side effects of prescription medications and pain; (2) limited manual dexterity; and (3) a limited ability to remain seated for an extended period of time. Such non-exertional limitations can be important aspects of vocational capacity. See Rabuck v. Hartford Life and Accident Ins. Co., 522 F. Supp. 2d 844, 876-77 (W.D. Mich. 2007) (holding that failure to consider non-strength limitations of former company president with short-term memory limitations rendered Transferable Skills Analysis "incredible").

For low skill, sedentary and light duty positions, bilateral manual dexterity, and the ability to remain in a particular posture are important non-exertional limitations. SSR 83-14, "Capability to Do Other Work--the Medical-Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments," available at 1983 WL 31254 ("[B]ilateral manual dexterity is necessary for the performance of substantially all unskilled sedentary occupations."); SSR 83-12 "Capability to Do Other Work--the Medical-vocational Rules as a Framework for Evaluating Exertional Limitations Within a Range of Work or Between Ranges of Work" available at 1983 WL 31253 (noting that only a few highly skilled sedentary positions permitted changes of position at will), cited by Nelson v. Bowen, 882 F.2d 45, 48-49 (2d Cir. 1989).

8.    Social Security Disability Award

The term "disability" has a variety of meanings, depending on the context in which it is used. A statutory definition of disability such as that employed by the Social Security Administration ("SSA") is not binding when an insurance policy contains its own applicable

definitions.  See Kunstenaar v. Conn. Gen. Life Ins. Co., 902 F.2d 181, 184 (2d Cir. 1990) (definition of disability under Social Security law is not binding under ERISA).

The administrative record contains references to the monthly amount of a Social Security Disability Insurance ("SSDI") award to Bregman beginning in January 1997.  This amount was an element in the calculation of Bregman's monthly disability benefit due from Hartford Life. The Social Security Administration ("SSA") appears to have granted full disability benefits to Bregman and some level of disability benefits to his son, reducing the Hartford Life monthly payment from $6,022.22 per month (the full amount to which Bregman was entitled) to $3,856.22 per month.  The Court finds that the SSDI award may be considered, but is not dispositive as to whether Bregman was totally disabled according to the definition in the Hartford Life policy. Moreover, because the decision of the SSA is not in the record, the SSDI award also can not inform the Court's evaluation of whether Bregman was disabled as a result of physical conditions, mental illness, or a combination of the two.

E.      Evaluation of Bregman's Disability

Although the Court does not give controlling weight to the opinions of Bregman's treating physicians, the Court is persuaded by those opinions, in conjunction with the other evidence contained in the record, that Bregman was "Totally Disabled" under the definition contained in Hartford Life's LTD insurance policy.  The Court finds that this disability was the result of the combination of physical conditions Bregman suffered, and that Bregman would have been totally disabled under the policy's definition even in the absence of the mental conditions from which he also suffered.  Bregman is therefore entitled to continuing LTD benefits according to the terms of the policy.

V.     Plaintiff's Claim for Attorney's Fees and Costs (Count 2)

The Court directs the plaintiff to submit further briefing concerning the additional relief sought including attorneys fees, costs and interest.

VI.    Conclusion

The plaintiff's Motion for Judgment on the Record [Dkt. # 44] is **GRANTED** and the Defendants' Motion for Summary Judgment [Dkt. # 38] is **DENIED**.


**SO ORDERED** this 23rd day of September 2008 at Hartford, Connecticut.


_____/s/ Christopher F. Droney_____

CHRISTOPHER F. DRONEY
United States District Judge